Judge Marshall delivered
the Opinion of the Court.
This bill was filed by three of the heirs of Nicholas Russell, senior, deceased, against Thomas Russell, the fourth and only remaining heir, who was also administrator, and against Nicholas Russell, junior, R. D. N. Morgan and the securities of Thomas Russell in his administration bond. Its object is to obtain a decree for the distributive share of the complainants in seven negro slaves (or their value,) of which their ancestor, Nicholas Russell,' senior, died possessed, and which came to and were in the hands of the defendant Thomas Russell, after the death of his intestate, and while he was administrator, and of which a part still remain in his possession, while the residue were delivered to, or permitted to be taken by, his son Nicholas Russell, junior, and one of them sold by him, to the defendant Morgan.
The complainants’ right to a division is resisted on the ground, that Nicholas Russell, senior, the common ancestor, had, some two years before his death, executed a deed of gift to his grandson Nicholas, for all these slaves, retaining their services until his own death, at which time his grandson Nicholas, junior, was to have them in possession; and the main question in the case, is whether this deed was, or was not, obtained by fraud.
It appears that, on, the 13th day of June', 1829, the deed in question, bearing date on the — day of April preceding, was presented for proof and record in the clerk’s office of the Bullitt County Court, by the donee, Nicholas Russell, junior, who was accompanied by the two subscribing witnesses, Cowen and M’Gahy. The *41 clerk says, that the witnesses evinced some amazement when they understood they were to., swear to the execution of the deed, but they did prove it in the usual form. He further says, that the donee desired him to say nothing, about the deed, and that upon being informed that it was a public record, which the clerk could not control, he manifested great solicitude, and directed the clerk, if any one should find out the deed was there, to tell them, that Mr. Morgan was his attorney and would attend to his business..
Suit by N. R, sen. (in his life .time) v. N. R. junior, to set a* side the deed, for fraud in obtaining it; in the record of which, there is much, strong proof to support the bill. But before .the trial the comp’t ;(N.R. sen.) died 5 and his administrator— father ■of the fraudulent grantee, dismissed the suit. This ■was a fraudulent act °n his as adm’r—m$e} p 48,
On the 29th day of August, 11329, Nicholas Russell, senior, filed his bill against Nicholas, junior, alleging, in substance, that a paper was read to him, as a power ■of attorney authorizing the defendent Nicholas to draw some money that was coming to him; that he was very ■old and infirm, and that his signature to this deed had been procured by imposing it upon him as the power of attorney which had been read to him; that he never intended to make such a deed, and did not know that he was executing it, and that it was without consideration or inducement. He prays that the deed may be can-celled and held for naught, and puts the usual interrogatories to the defendent.
•In answer t© this bill, N. Russell, junior, denies, that , , , _ , , , . . the deed was fraudulently obtained, or that it was executed under a representation that it was a power of attorney Ho draw a pension,’ or any sum of money, &cP 'but alleges, it was fairly done, and fully understood by 'the complainant, and for a good and valuable considera* tion, “to wit; blood and services rendered; that, at the age of about seventy-five, his grandfather had married a second wife., and to secure tiie negroes to Ids own blood, ■formed a part of his inducement, he has no doubt, for executing the deed, and because his wife was trying, by shifts and contrivances, to defraud his own heirs of bis property; and that he believes, she and the husband of .her daughter by a former marriage, are carrying on this suit.”
Many depositions were taken in this suit, and it was in the progress of vigorous preparation when, in April, f831, the complainant, N. Russell, senior, died, at the *42 advanced age of eighty-thi’ee or four years. And a'i the succeeding July term of the Bullitt Circuit Court, Thomas Russell—having been previously appointed ad-minis trator of the estate of his father—had the suit dis- . - missed.
The bill alleges ters, made exhi^dfi'm'a'de^n" dant;heanswers, notwriie them-held that the antlwTetters^enuine.
Residence of the m^rtieir ^ntorcourse with the grantor, J\. It. sen. his person-property101' and
The consideraa°deed that purports to convey perty of a'decayed andfeeUe^d children livings) to a grandson— are “care, attention and many services rendered by him—love and affection for him—and other good causes.”— Theproof shows that the “care” §-c. were very trivial; and no proof that the donee was a peculiar favorite of the donor: To •supportthedeed, it should appear that its import and consequences were clearly understood by the grantor, and that he was capable of a free S¡intelligent disposition of his property.
*42 In October, 1832, the present hill was filed, and the whole of the proceedings m the former suit are made Par* as are> a^so? ^our letters, which are exhibited, and alleged to have been received from the defendants, Thomas and Nicholas Russell, during the pendency of the first suit, and in relation to the subject matter there-Thomas Russell says, in his answer, that he did not write the- letters; but he does not deny that they were sent by him, and were in fact his letters; and Nicholas makes no response upon the subject. We are therefore of opinion, that these letters are to be considered as genuine, and as the acts of the parties by whom, they purport to be written. The denial of Thomas Russell does not meet the allegation, but is obviously evasive, and the matter was certainly within his knowledge.
The complainants, it seems, resided in another state, at t-he distance of perhaps two hundred miles from their father. The defendents Thomas and Nicholas lived ... , . about a mile lrom him.
It further appears, that the old man was about eighty-three years of age, dim of sight, dull of hearing and weak in intellect; that he owned a poor piece of land where he lived, for which he could not get four hundred dollars; that his personal property did not bring over seventy dollars, when sold by his administrator; that the advancements made to his children, had been very trivial, and that the negroes mentioned in the deed of gift constituted about four fifths of all he was worth at the time.
The deed expresses that, “for sundry good causes and weighty considerations,for the care, attention and many services rendered unto .me by my grandson, Nicholas Russell, junior, and for the love and affection I have for an(f other good causes I have, moving me thereunto, I, for the above considerations, have given, granted” &c. *43 All these considerations dwindle-down, in the proof, to ■a few trivial attentions and accommodations gratuitously rendered; such as any relative or neighbour might be expected to render under similar circumstances, and which, if they were valued, could scarcely have exceeded the fiftieth part of the value of the gift. There is no sufficient proof of any special inducement or affection, operating exclusively in favor of this grandson, nor of any cherished intention to make him the peculiar ■object of the grandfather’s bounty. The wish to give the property to his own blood, and to thwart the schemes of his wife for preventing it from descending to his heirs, which is referred to in the first answer of N. Russell, junior, as constituting in part the inducement to the execution of the deed, certainly does not account for an act by which he passed over the immediate partakers of his blood, and cut off his heirs from all right to the property.
It is [proved that a grantor, aman very old and infirm in body and mind, was kept in servile subjection to his second wife and a servant, and dared do nothing contrary to their wishes: that fact shows also, that, in their absence, he was liable to be imposed on hy others, in whom he had confidence, and tends to confirm other circumstances indicating that his signature to a deed of gift was ob» tamed by fraud.
When, in addition to the extraordinary character of the act itself, and its apparent want of inducement, we refer to the condition of the donor, as proved by the donee himself, in the first -suit—the necessity of accounting fully for the making of such a deed, or of showing that it was made with a full comprehension of its import and consequences, and that the maker tvas entirely competent in mind to make a free and intelligent disposition of his property, becomes strikingly obvious.
In. addition to the ordinary infirmities of mind and body incident to extreme age, or as an exemplification of their effects in this instance, it is proved that, the grandfather was in a state of almost servile subjection to his second wife and one of the slayes mentioned in the deed; that they made him do what they pleased, and that he was afraid to do any thing in opposition to their will, or was at least afraid that any such act should come to their knowledge. This was proved in order to account for the secrecy and apparent management with which the execution of the deed was procured, in *44 the absence of the habitual inmates and guardians of the donor. But while these circumstances may indicate, that the deed would not, and could not, have been executed if the wife and servant had been at home, they also prove the donor’s mind and will to have been in such a state of dependent weakness as to become an easy prey to the artifice or insinuations of any one in whom he had confidence; and we are naturally led to seek in this condition of his mind, the causes of the extraordinary act in question; unless the suspicion, not to say presumption, arising from all the facts which have been adverted to, is rebutted by satisfactory proof of perfect free agency and full comprehension on the part of the donor.
A grandson conceives a plan to gét a deed of gill of his grand-rather’s property in this way: to have a power of attorney, which the old man intended to mokes drawn; the deed of gift also; to read the power, and when he is about to sign it, slip the deed into its place, and let him sign that, thinking it to be the power. This plan the grandson discloses to persons whom he requests to aid him, S¡ witness the deed; but they refuse. Such a deed, however, is afterwards obtained by the grandson, and he tells those persons it was obtained in that Way, fye. Tho’ the deed is regularly proved by subscribing witnesses, the foregoing facts conduce strongly to show, that it was obtained by fraud.
*44 In this case there is no such satisfactory proof. On the contrary, the suspicion which grows out of the character of the gift and the relative condition of the parties, is confirmed by the evidence more immediately connected with the deed.
It is proved that the grandson, upon some understanding that he was to be authorized by his grandfather (by power of attorney,) to act for him, in relation to a pension, conceived the plan of reading the power of attorney to him, at a time when the usual inmates of his house should be absent, and then, by presenting the deed to procure his signature to it, under the belief that it was the same paper; and that shortly before the date of the deed, he proposed, separately, to four persons, to cooperate with him in this plan by becoming attesting witnesses to the deed. These persons refused to cooperate in the scheme. But after the deed was executed, he told two of them that he had procured it in the manner he had previously suggested; but informed the other two, that his grandfather had executed it willingly. Upon all he enjoined secrecy on the subject. He also requested a neighbor, after the deed was signed, to inform his grandfather, that according to the opinion of an eminent lawyer, he could not obtain a pension.
And what is the evidence, by which all these circumstances, tending so strongly to establish the fraud, are to be rebutted. The two subscribing witnesses have *45 sworn, that the deed wassread to the grantor previous to its .execution; that he understood its contents, which they say accorded with his purpose, and that he voluntarily signed the deed. They say nothing however.in direct terms as to his mental capacity, and it does not appear that they were qualified either by previous acquaintance, or by any observation at the time, to judge upon that subject. Nor is there any such proof of their own capacity, or general intelligence, as to give to the mere fact of their attesting the transaction the effect of evidence on this point, in a'case where evidence in relation to it is required.
Recital of facts and circumstances calculated to detract from the weight of tiie testimony, and effect the credibility of the subscribing witnesses to a deed: viz. (1.) They were procured by the. grantee, after oth ers whom lie told of his intended fraud had refused. (2.) They were strangers to the grant°r> and had no fixed fesidence near him. ^ ,No. crosi? uniform habit of ¿lepositions^'to give notices bare-to ^convenient to the other par¿repanctes inthé conversations of the witnesses about n,e matter.
But the evidence of the subscribing witnesses, even upon those points to which their testimony does extend, is materially affected by several considerations. (1.) They were picked up merely for the occasion, after several other persons had refused to be witnesses, and although it is not proved in what terms they were invited to accompany N. Russell, junior, as witnesses, the pre-existing fraudulent purpose in his mind, and the propositions previously made to others, are calculated to excite some suspicion, that a similar communication was made to them, and that they were induced to lend their aid to' the commission of the intended fraud. If this were proved as a fact, it would destroy their credit in , . . r . . ii,. , the case. As an inference it is calculated to ípipair the weight of their evidence. (2.) The fact that they were not, so far as appears, the friends, or even acquaintances, of N. Russell, senior, and that they do not appear to have had any settled residence in the neighborhood, though not perhaps calculated to affect immediately their credit as witnesses, affects it indirectly in this transaction, by giving additional ground for the presumption that it was not intended to be a fair and open one. (3.) The depo- - .. , -, . sitions of these two witnesses were taken without cross examination, and apparently with little opportunity for it—as the notices for taking these and all the other depositions on the part of the defendant (in the case of N. Russell, sen. vs. N. Russell, jr.) were served on the day before the depositions were to be taken. The uniformity of this practice, in a case in which the opposite party was *46 eighty-three years of age and exceedingly infirm, is another circumstance bearing unfavorably upon the cause of the party who pursued it: while the want of cross examination, though it be without the fault of the witness, manifestly detracts from the effect of his deposition. (4.) It is proved, that Cowen, one of the subscribing witnesses, in conversation with another person on the subject of this deed, told him that at the time of the execution,of the deed, N. Russell, junior, read the power of attorney to the old man, and that the deed of gift was signed without being read. It is also proved, that M’Gahy, the other witness, said, on one occasion, that the old man understood what was in the deed, if he was in his senses; and that, on another occasion, he said the deed of gift was about. half read over, when the old man said that would do, and that he heard nothing of the power of attorney. M’Gahy appears to have been extremely illiterate.
Secrecy enjoined as to every thing relating to a deed of gift—tho’ the reason assigned for it, was to pre vent disturbance in the grantor’s family—is indi-, cative of fraud.
*46 In their depositions, these two witnesses both state, that the deed was read, but M’Gahy, upon being asked if old Russell did hot understand its purport, answers, “yes, from the willingness to sign the paper he did know it.” His other answers are principally mere affirmatives or negatives to leading questions. Cowen states explicitly, that the purport of the deed was fully known.
The conduct of these witnesses, when they were first called on to prove the deed in the office, and all the circumstances which have been mentioned in relation to them and their depositions, seem to accord too much with the idea that they had willingly or unwillingly become the instruments and abettors of an impudent and wicked fraud; and the evidence in relation to their honesty and truthfulness, can neither relieve them from the strong suspicion to which they have subjected themselves in this matter, nor redeem the transaction itself from the deep stain of fraud with which the intentions and the actions of the principal agent have infected it.
The privacy attending the execution of the deed—the secrecy enjoined by young Russell upon all those to whom he mentioned the subject, and the extraordinary injunctions addressed to the derk himself in whose office *47 it was to become a public record, are attempted to be accounted for by referring them to the fear lest his grandfather’s life might be rendered miserable, if his wife and servants should discover what had been done. But they may be accounted for, at least as well, by referring them to an anxiety that his grandfather himself, and his uncles, the present complainants, might be kept in ignorance of the fact which had occurred. These unusual precautions for keeping the matter secret j harmonize rather with the artifice and stratagem which he had first meditated and prepared for execution, and with the plan he had adopted for stopping any enquiry as to what might' have been done by him under the power of attorney, than any of these acts does with the idea, that the transaction was ultimately a fair one, and that his caution proceeded from a regard for his grandfather’s quiet in his family.
Artfjil, deceitful contrivances in the defence of a suit, brought to have a deed can. celled, and recover the property conveyed ■—held to be indicative that the. deed was obtained by fraud.
Passing on to what occurred after the existence of the deed became known, we discover in the defence of the suit brought for its cancelment, on the part of N. Russell, jr. and his father, Thomas Russell—by whom he was aided in his attempt to sustain the deed—an apparent system of management and deception, calculated to give strong corroboration to the conclusion already adopted. The letters especially, which were sent by them to the complainants, daring that period, furnish, when compared with the subsequent conduct of the writers, in dividing the negroes between themselves, the strongest evidence of deep deception and treachery, and leave no room for charitable inference in regard to any part of their conduct.
The subsequent attempt in the present suit, by amended answer, filed some twelve months after the original answers, to set up, in aid of the deed, another writing, purporting to be an order from N. Russell, senior, during his life, to dismiss the first suit, and expressing his wish to confirm the deed, not only fails in creating any inference favorable to those who made it, but, in o.ur opinion, recoils upon them and gives triple assurance of their guilt. The order thus introduced, bears date the 2d of April, 1831, and is attested by two of the defendants, brothers of N. Russell, junior, and securities of T. Rus *48 sell, in his administration bond. Its existence, if genuine, was known to all the defendants, and they could scarcely have forgotten it. Why did they so long keep hack this important document? It appears, that at the time when this order bears date, N. Russell, senior was on his death bed. A few days before, he was sick iii bed, out of his senses, and incapable of business. A few days after, he died, worn out with age and exhausted in all his faculties. Did he revive, and l'egain his intellects, in the brief interval, to do this last important act for the disinheritance of his children? There is a statement in the record to that effect—not sworn.to, nor signed, but admitted to be read as if it were a deposition; but it is too much in opposition to the general tenor of the facts, and to the previous deposition of the same person, to command our belief. • Various circumstances might be referred to as discrediting this statement, which stands, not upon the oath or veracity of the person whose statement it purports to be, but upon the mero admission of counsel—procured we know not how, and made we know not why—that it should be read as a deposition.
The deed set a slde’
Atto who had been employed t~dejujJNfo7_ iner suit, brought ^oj afterwards pur-' s'av^s^onveyed! js not an inn<y andmustsipren<j“ ■> ■ i':': V
*48 But we deem it unnecessary to go further into detail ■on this branch of the subject. We are satisfied, from a consideration of all the circumstances, taken in connection with the previous conduct of the parties, that the order was not the act of N. Russell, senior, and we look upon the fabrication of it, for the purpose of getting rid of the first suit, and the attempt to set it up and prove it, in avoidance of the present one, as additional instances of fraud and imposition intended to consummate the object of the first, and calculated to stamp the whole transaction with a deeper dye of criminality. We are also of opinion, that the dismission of the first suit by Thomas Russell, the administrator, was, as charged in the present bill, a fraudulent act, clone in violation of his duty as administrator, and for the purpose of gain.
We are of opinion, therefore, on the whole case, that the deed to N. Russell, junior, should be set aside, for fraud in procuring its execution; that the slaves, for all that appears in this case, wore the property of N, Russell, senior, *49 at his death, and that his administrator, into whose ppssession they afterwards came, was bound to treat them as a part of his estate, to which there being no creditors, his heirs were entitled; that in permitting a part of them to be taken by his son,N, Russell, junior, claiming under the deed of gift, and in claiming to hold the residue by trails-fer from Nicholas, he has committed a breach of his duty as administrator, and acquired no title to the slaves; that such of the slaves as have come to the possession of N. Russell, junior, by virtue of the deed of gift, with or without the act or assent of the administrqtor, are held by him in trust, and subject to the interest of the complainants, as heirs of N. Russell, senior; and that the defendant Morgan, who acquired one of the negroes (Maria) from N? Russell, junior, haying been his attorney in defending the suit originally brought for the cancelmentof the deed, and apprised of the ’.circumstances as therein developed by the proofs, is not an innocent purchaser, but is bound by the trust to which the title qf his vendor was subject, on account qf the fraud in procuring ¡he deed.
Decree,
A party qbfajijs a deed of slaves^ by fraud— thó grantor to retain possession for life. He brings sijitto cancel the deed; but diesbefore the hearing, andhis admThav ing received thó slaves, and permitted his son, the 'fraudulent grantee, to take them—dismissed the suit. The heirs dfihe gran t- or bring suit to set aside the deed and have distribution of the slaves; in which they succeed.— The decree for the slaves, if to be had, and their hire, deducting the expenso of the young ones, & c. As to any not produced, the hire, fyc. (1) against the administrator, for the whole value, and against his sureties to the amount of the bond; (2) against the fraudulent grantee for such as he received and fails to produce, and against a party who (knowing the fraud) purchased one from him. And for distribution.
The complainants, as heirs of N, Russell, are entitled to a decree for a division of the slaves mentioned in the .deed of gift, and the after born child; all of which af¡erwards came to the possession of their co-heir, Thomas Russell. In this division, each of the complainants is entitled to one fourth of said slaves, together with the reasonable hire from the death of their ancestor, subject to a proper deduction for care and trouble in raising any of them which may have been an expense on account of their age; and if their portions cannot be made up in kind, in consequence of any of said slaves having been transferred, or permitted by the administrator to be taken out of his possession, so that they cannot be subjected t,o the division, the value of such slaves at the time of the division, is to be taken as a part of the dividend. And for the deficiencies in ¡he portions of the .corpplainants, the defendants should be rendered liable in the fol *50 lowing manner:—Thomas Russell, the administrator, is to be held liable to the extent of the whole deficiency* and the defendants Thomas' Russell, junior, and William Russell, his securities, are to be held liable for the same* to the extent of the penalty of the administration bond-N. Russell, junior, is to be held liable for the same, to the extent of the value of such of the absent slaves as he is proved to have received or taken from the possession of the administrator; and the defendant, Morgan, for the value of Maria, if she should not be forthcoming to be taken into the division. It does not appear from the pleadings or evidence in this case, that there is any other person interested in the division of the slaves, besides those who are made parties; if there should be any such person, his or her interest will not be affected by the decree.
The decree of the Circuit Court, dismissing the complainants’ bill, is reversed, and the cause remanded with instructions to render a decree in conformity with this opinion.