Judge IIise
delivered the opinion oí the Court;
J.VC03 Madeira was the owner of a number of town lots in Covington, including those designated in the plan of the town by the numbers 234, 235, 236, and 237, situate between Sanford and Greenup streets, and north of Fifth street:'he also owned the ground lying between Greenup street and Sanford street extended, and- having Ffth street on the north, and the town boundary on the south. In the latter part of the year' 1823 he died in the city of Cincinnati, leaving a wife- and three infant children-, to wit: George, Addison D., and Aston Madeira. George Madeira died shortly afterwards without issne.
Mary Medaira, the widow, E. S. Haines,-and O. M. Spencer, were appointed and qualified as administrators of Jacob Madeira’s estate in the city of Cincinnati, where they and the family of the deceased resided at' the time. O. M. Spencer did not long survive his appointment.
In May, 1831, William Hopkins filed his Bill in chancery in the Campbell Circuit Court against Addison, • George, and Aston Madeira as the heirs, and against Spencer and Haines as the administrators of-Jacob Madeira, deceased. Who were all charged to be nonresidents, and alleging in substance that he hád purchased from Madeira, in his lifetime, the lots and block of ground above described on the 15th of July, 1828,-for the sum of $600; $200 of which he charged was paid in cash at the date of the contract, and the bal-lance to be paid in six, twelve, and eighteen months, with *596 interest until paid, that Madeira then executed and de-bvered his bond to him, to convey the said lots which Hopkins professes to exhibit in the bill, (although no such bond is now produced, nor is it shown that any such was ever in fact lodged with the papers, or filed in the cause.) He alleges further, that of the ballance of the purchase money he paid to Jacob Madeira, deceased, on the 11th day of May, 1829, $106.50 for which Madeira gave a receipt in writing on the bond— that on the 5th December, 1828, he paid to Madeira’s administrator fifty dollars, as shown by his receipt on the bond, and that he paid also to the administrator on -day of-seventy-five dollars in a note on Thos. D. Carneal, that there was yet due of the purchase money $175 as claimed by the administrator, which he professes to tender in Court as being the balance of the purchase money, and interest due on the contract. On the same day this bill was filed, and at the same term an order of warning was entered, and publication thereof directed. But it does not appear that publication was ever actually made, or that there had been any service whatever, either actual or constructive, upon the heirs or administrators of Jacob Madeira, deceased, or either of them. Nevertheless, at the next ensuing term of the Court, on the 6th of August, 1829, a guardian ad litem was appointed to answer and defend for Madeira’s infant heirs, who forthwith, on the day of his appointment, filed their answer, in which they profess to be ignorant of the matter alleged, and claim that their rights and intérests may be protected by the Court, and thereupon at the same term, and on the same day, in the absence of any proof whatever to sustain the allegations of the bill, a decree is rendered which, after reciting that the cause was heard by consent, orders and decrees that “unless the defendants shall, on or before the 15th day of the present month of August, execute to the complainant, William Hopkins, a deed of conveyance, relinquishing all their right, title, and interest in and to the lots of land mentioned *597 and described in the complainants bill, thatin- that event Thomas N* Lindsey, who is hereby appointed commissioner for that purpose, convey, by proper deed of relinquishment, all the estate, right, title, and interest in and to the lots of land mentioned and described in complainant’s bill, and report, &c. And it is further ordered that upon the execution of the deed aforesaid, the Clerk of this Court pay over to the defendants, Haynes and Spencer, the administrators, the sum of money now in Court.”
Lindsey, the commissioner, by authority of this decree, executed a deed to Hopkins, dated 21stof August,. 1831, conveying to him all the right, title, and interest, of Aston, Addison D„ and George Madeira, as heirs of Jacob Madeira, deceased, in and to the lots numbered 234, 235, 23.6, and 237, but the commissioner omitted and failed to include in this deed the bfock of ground between the said lots and the town boundary.
This deed was reported by the commissioner at the October term of the Court in 1831, and ordered to be recorded. The omission to include the block of ground above named in the deed referred to, having been discovered, doubtless the same commissioner, after more than two years had elapsed, executed a second deed to Hopkins, dated the 4th November, 1833, including therein the block of ground, as well as the lots which had been previously conveyed, and on the same day reports this last named deed to the Court which, upon his acknowledgment, was ordered to be recorded.
Hopkins, about the time or shortly before he instituted this suit, took possession of the lots and the adjacent land, and continued in possession until he sold .the same in different lots and parcels to Thomas Green, John W. Clayton, .James Hopkins, and James M. Gaines, all of whom, (holding under the complainant, Hopkins, by executory contracts and deeds of conveyance,) .or their vendees, are now in possession of the said lots and block of ground since laid off into lots, and upon which considerable improvements have been *598 made. Wm. Hopkins doubtless apprehending that he had not secured the title by the proceedings begun and terminated in the Campbell Circuit Court, as above recited, after the county of Renton had been formed, so as to include the city of Covington, which before had been embraced in the. county of Campbell, on the 23th June, 18-48, files his bill in chancery, in the Kenton Circuit Court, against Addison D, and Aston Madeira as the heirs at law of Jacob Madeira, deceased, alledg-ing that they were non-residents, and that the title-bo nd of their ancestor (which he had professed to exhibit in his bill ol'ISbl,) lor the lots and block of ground in controversy liad been either mislaid or ¡improperly takeu out of the papers of the former suit, and had been lost, so that after dilligent. search and inquiry he was uot able to find it. He alledges that he had paid to Madeira, in his lifetime, and to his administrator since his death, and by the tender and deposit in Court, when his first suit was pending in the Campbell Circuit Court, $175 in cash, the whole of the purchase money due, and asks for a decree to establish the lost bond, for a surrender of the title of Madeira’s heirs, and for a conveyance of the property to him by them, or by a commissioner.
Second suit of Hopkins ns :lie 'heirs, i\c., and I-rjceetliugs Imd.
■Answer of A. D. Madeira made a .cross b. 11.
A. D. Madeira, no doubt, hearing of the institution of this suit, though a non-resident, without service of process, and having in the mean time attained the age of twenty-one years, answers the bill of Hopkins, denies the allegations of complainant made therein, sets up claim to the property as one of the heirs of Jacob Madeira, deceased, and by cross pleading demands to have the possession delivered to him and his brother, (who^also appeared and plead,) and that an account be taken of rents, and for general relief. The decree and subsequent proceedings had in the suit in the Campbell Circuit Court in 1831, arc relied upon in this case by Hopkins, and his vendees in their defence to the cross bills of Madfeira’s heirs, who exhibit the entire record of that suit in their pleadings, and assail the de *599 cree rendered in that case as wholly fraudulent and void.
Decree of the Circuit Court & agreement of par lies as to its re* vision.
After the vendees of Hopkins and the persons in possession of the lots were all made defendants, served and brought regularly into the case, the proof taken, and the case submitted, the Circuit Court rendered a decree against Madeira’s heirs, pronouncing the former decree to be void, and directing them to convey the lots and the block of ground adjacent, as mentioned in the bill, on or before a given day, by a deed warranting the title against all persons claiming under their ancestors to the extent of the estate inherited, or to be inherited from him.
As before observed, the decree rendered in the suit of 1831 is expressly impeached in this case as erroneous, fraudulent, and void ; and the record thereof is exhibited, and Hopkins and his vendees rely upon it in defence. Although the cross bill of Madeira’s heirs may not present, in its form, technically the precise features and characteristics of a bill of review, yet it has all its essential and substantial requisites. And the Court below, upon the pleadings in this case, had authority and jurisdiction to try and determine upon the validity of that decree, and if it was erroneous, as apparent from the record, or void or voidable, the Court might properly, in this case, have so adjudged and decreed. If correct in this view, the writ of error prosecuted by the plaintiffs in error to the decree in this case presents Cu* tho revision of the Court both decrees for reversal, if there he error, and for affirmance if there be none. However this may be, both decrees are before this Court for revision, and errors assigned as to both as though writs of error had been prosecuted in due form in each case, by express agreement of the parties in writing filed with the record, made, doubt-1 less, to save unnecessary expense and to avoid a multiplicity of suits. For it seems Madeira’s heirs were also prosecuting an action of ejectment against the parties *600 in possession in the Circuit Court, which was discontinued upon the faith of this agreement.
A decree without service of process aetutfl or constructive, 'held to be void.
The answer of •guardian ad lit-‘677t putting com-'plainanc on the proof of the allegations of his bill, no decree «can be rendered for complainant "without proof: (6 B Monroe, 4247.»)
The decree of 1831, rendered by the Campbell Circuit Court, is at least erroneous, if not absolutely void, for the following reasons.
1st. There was no service of process upon the defendants, Madeira’s administrator and infant heirs, who were non-residents, either actual or constructive.
2d. The decree was wholly unauthorized, because, upon the answer filed for the infant heirs by a guardian ad litem appointed to defend for them, the complainant, Hopkins, was put upon the proof of the allegations in his bill, that he had paid the purchase money for the lots, and that such bond as that alleged to have been granted by Madeira, did infact existat all, as it does not appear to have been produced. But the Court forthwith, upon the billandanswerswithoutproofof any single allegation made by complainant, renders a decree against the defendants, divesting them of their right to their property, when, as the record stands, it does not appear whether such bond as that described then, or ever, in fact, existed, except by the allegations of the bill unsupported by proof. For though the guardian ad litem was irregularly appointed when the infants-were not served, yet, having answered for them, placing them, as infants, without information of the matters alleged, under the protection of the Court, it was error to decree against them at the very term at which the answer was filed, and in fact no decree should have been given against them without proof of every material allegation in the bill. See the case of Chambers, &c., vs Warren, (6, Ben. Monroe, 247.)
If this decree of 1831 be set aside and reversed for the gross and manifest errors disclosed by the record, then Hopkins’ claim, so far as attempted tobe sustained by it, and the commissioners deeds made under it to him, must fail, and his vendees, and those holding under him, are in no better condition. If Hopkins’ title fails, those who hold under him can derive none from him.
A purchaser is presumed to know ihe deriva tion of the title of his vendor held under a decree against infant and nonresident heirs, the rule caveat emptor applies to such purchaser! (4 Dana, 48. 9 B. Monroe, 230.)
The parties in possession holding under Hopkins, find this link broken in their chain of title in attempting to make out its derivation from the plaintiff in error.
Whether the decree and subsequent proceedings of 1831 be impeached and set aside in the present suit for gross apparent errror or for fraud, or by a reversal as uponawrit of error now prosecuted under the agreement of the parties, the consequences would be the same; that Hopkins’ title, as thence derived, must fail, and his vendees can derive no title from him. They cannot be protected as innocent purchasers, having procured the legal title against an outstanding prior, but undi-vulged equity, of which they had no notice. 'They must be regarded as having constructive notice of all which is disclosed by the record with respect to their chain of title. In tracing the title of Hopkins, as shown by the record, they must have found that he field, under commissioner’s deeds, made in virtue of a decree rendered against Madeira’s infant and nonresident heirs, subject to be reviewed, impeached, and set aside as fraudulent and void, or reversed by this Court at any time before a writ of error’ should be barred by lapse of time. And a purchaser of land at private sale, holding under a party who has attempted to procure title thereto by a decree of .a Court of Equity directing a conveyance to be made to him by a commissioner, who, without the intervention of a a public decretal sale, does convey to such party, must purchase, under the risk incurred, that the decree constituting'a fink in his chain of title, is subject to be reviewed or reversed, and so long as it is so subject, he will be regarded as a purchaser pendente Hie, and the rule, “ caveat emptor,” applies to him. This view is abundantly sustained by the opinions of thi's Court heretofore pronounced-in the cases of Debell vs Foxworthy's heirs, (9, Ben. Monroe, 230,) and Clary, etc., vs Marshalls heirs, (4, Dana, 98.) In these opinions the distinction is taken between cases where a party derives title by purchase at a public sale by an officer oT agent *602 of a court of competent jurisdicton authorized by a judgment or directed by a decree of such Court. And in cases where a party, by the judgment or decree itself erroneously rendered in his favor, procures, without the intervention of such judicial or decretal sale, a defective title directly adjudged or decreed to him.
But if the par-chase bs under a decretal sale,the right of the purchaser in general will not be affected, though the decree be erroneous if it be not void.
In the former case the title, in the absence of fraud, will not be disturbed, whether the judgment or decree if not void, but merely erroneous, be or be not reversed. In the latter case the title of the party and those holding under him is subject to fail and to be defeated by the reversal of the judgmental law, or decree in equity, under which such title is derived. The reasons for this distinction are apparent, and have been so fully presented in the cases referred to that it is not necessary to add to or repeat them.
In the opinion delivered in the case of Talbot’s executors vs Bell's heirs, (5, Ben. Monroe, 326,) it is declared that when the title and possession of land has been procured by an erroneous decree which is after-wards reversed, the chancellor may and should direct the possession to be surrendered, and that an account should be taken of rents and proffits, waste and improvements upon equitable principles, and full justice be done between the parties.
The title of Hopkins and his vendees thus failing, so far as it is attempted to sustain it by the decree and commissioner’s deeds of 1831. the question is directly presented upon the errors assigned to the decree of the Kenton Circuit Court rendered in September, 1850.
It is insisted that the decree should be reversed, because,
1st. It is not satisfactorily proven that Madeira ever did execute and deliver any title bond at all to Hopkins, by which he bound himself to convey to him the lots and ground in contest, and that if there was ever any contract between the parties in that respect, it was. not written but verbal merely, and that it was not executed by the payment of the purchase money, or the *603 conveyance of the lots, before the death of Madeira, ■which occurred shortly after, in 1829.
2nd. That if it be conceded that Madeira had executed and delivered in his lifetime, a bond for the conveyance of any lots, or ground, in the town of Covington, to Hopkins, and that it was lost; yet that a Court of equity cannot decree a specific execution of such contract, and direct a conveyance of the lots and land in contest, to Hopkins, because the contents of the lost bond have not been satisfactorily shown by the proof. And because it does not appear with sufficient certainty what was the number and position of the lots and land to be conveyed, or at what time and upon what terms, and conditions the conveyance was to be made. As to the point first made. It may be remarked, that from the gross inconsistencies, contradictions, evasions, and false statements, so easily detected in the bills exhibited by Hopkins, in 1831, and in 1848, and in his answers to the cross bill of Madeira’s heirs, when compared with each other, and with the depositions in the case, and especially that of Haynes, Madeira’s administrator* doubt might well be inspired as to whether any written contract had been executed at all by Maderia, for the sale of the lots in contest to Hopkins. But Carneal proves that a title bond for the conveyance of several lots in Covington, was executed and delivered by Maderia, to Hopkins, and it should not be assumed in direct opposition to the evidence, of Cai’neal that no-such bond ever existed.
The force and validity of the second objection presented, must depend upon the effect to be given to the evidence of Carneal, who is the only witness by whom the existence or contents of the’written contract alleged, is proven.
If the bond itself, was in existence, it should describa the lots that were sold and if the consideration be not paid, also the terms and conditions upon which they were-sold,the time and manner and amount of the payments to-be made with such certainty, that it might be executed* *604 specifically, according to its provisions, as collected from its perusal; without there being any necessity for a resort to be had, to oral evidence, to ascertain the mutual rights and obligations of the parties. And so if the bond be lost, and its loss is to be suppllied by proof of its cohtents. The contents as proven, should so indentify the lots sold, as that a Court of equity would be able to ascertain by the description given, in case the writing was in existence, and produced, what land was to be conveyed; and further, if the consideration be not executed, and the purchase money not paid, and it appears that the lost bond provided that the land was not be conveyed until after the price agreed to be given, was paid, in such case, the proof should show the terms of the contract, as to the amount of the purchase money when due, &c. • So as that the Court might know if the contents of the bond as shown, were reduced to writing, from its inspection alone whether the party had entitled.himself to a specific execution by a compliance with the terms and con.ditions imposed on him by the contract, otherwise according to the statute of frauds no action or suit can be maintained to enforce it, nor can a Court of equity decree its specific execution. In fine the complainant in this suit is not entitled to the relief sought unless it be proven that a bond once existed, that it is lost, and that its contents are such, as that if it existed now, it should and could be specifically executed, according toils terms, to be colllected from its inspection alone.
If an executory contract for ihe sale of land be executory on the part of both vendor and ven-dee, the writing itself should Bhow what are the terms of the contract to be perlorrned by each party, with out a resort to parol proof: See Kay & Ca ey vs Lurd. (6 B. Mon too, 10l.)
If a contract for the sale of land be executory in its character, both with respect to the undertaking of ono party to convey, as well as to the undertaking of the other to perform conditions in respect to the payment of the purchase money, to take the same out of the statute of frauds, it is necessary that the land should be so described on the one hand, and the consideration and terms on the other, as that neither party, in demanding specific execution, may be put to the necessity or permitted to go outside of the written contract to show by parol proof, what he was bound to perform, *605 or what performance he might exact from the other, to entitle the one or the other to have the contract enforced ; it is so settled in the case of Kay & Casey vs Curd, (6 B. Monroe, 101,) and other cases cited there; also in numerous adjudged cases in the Courts of several, if not all, the States of the Union, where the provisions of our statute of frauds have been literally or substantially adopted.
Proof of contents of lost bond for lots, analysed and determined lo be insufficient to authorize a decree fm specific performance.
The fact assumed and charged in the bills and denied in the answers, that Madeira had delivered his bond to Hopkins for the conveyance of the land in contest, is sustained by the testimony of a single witness, Thomas D. Carnea], by whom alone, also the supposed contents of this bond alleged to have been lost, is attempted to be proven. His statement is as follows:
“I purchased from him (Madeira) several lots, for William Hopkins, arranging with him for Hopkins to xeceive a note held by Hopkins against Samuel Winston for the first instalment. (A bond by Madeira was .given to Hopkins for the lots, and notes executed by Hopkins for the ballance of the purchase.) And on payment of the notes a title was to be made to Hopkins. Thus having closed the purchase for Hopkins, I -cannot say how that ballance was paid or the transaction closed.
•“The lots were west of Sanford street, and extended south to the Covington line, and included, where Hopkins, in 1828, made brick for me.”
•If the contract itself could be produced, and its terms were as vague and uncertain as the above statement of its contents, could it be specifically executed without aresortto parol evidence to ascertain, if possible, what was the total amount of the purchase money to be paid, at the date of the contract? In what instal-ments, and at what periods was the residue of the price to be paid ? And was, or was not, interest payable on the first instalments? If not, should then the parol ■substitute for the lost bond, as exhibited by Carneal’s deposition be enforced? When that parol substitute *606 itself cannot be specifically executed unless it be explained, amended, and added to materially by other parol proof as to the terms and conditions, upon a compliance with which Hopkins might demand a conveyance? The answer must be in the negative. Thedoc-trine that lost bonds may be supplied, set up and established by parol proof of their existence, loss, and contents, would be calculated to produce, of itself, much of the moral evil, (in the commission of frauds and perjuries,) which the statute of frauds was intended to guard against and prevent, unless in such cases clear distinct, creditable, and satisfactory proof should be required. How much more mischief would ensue, if the substitutes for lost bonds, presented in the form of statements of witnesses, given from recollection should be enforced by Courts of Equity, when so vague and uncertain as that a further resort must be had to blind conjecture and presumption, in order to learn the rights ■and obligations of the parties.
'The chancellor conveyanceor conildemionbo paid,
No witness but Carneal knows or proves that any written contract existed between Madeira and Hopkins, therefore no other can possibly know or prove what it contained. Other witnesses, it is true, prove circumstances and give their recollection of conversations with Madeira after a lapse of about twenty years had intervened, tending to show that there had been a contract verbally entered into between the parties with respect to the sale of the lots and ground claimed by Hopkins, but they cannot and do not prove the terms of such verbal contract.
Carneal’s deposition does not set forth a contract which can be executed, unless his omissions had beeiti supplied by other parol evidence which has not been done.
Madeira’s heirs have denied, and Hopkins has wholly failed to prove, the payment to Madeira in his lifetime* to his heirs or administrator since his death, the amount of the purchase money which he himself admits he was to pay for the lots. Carneal’s version of *607 the contract is, that the title was to be made on payment of the notes given for thepurcbasemoney. Now, a Court of Equity would not require Madeira’s heirs to convey, unless Hopkins should pay, or offer for paj ment, the whole amount of the purchase money and interest that might be due. But as the terms of the contract are not proven, as it does not appear what was the amount of the price to be given for the land. The Court cannot know from the contract itself whether Hopkins has performed, or will perform, the conditions upon which his right to a conveyance must depend. Carneal says “ he arranged with him (Madeira) for Hopkins to receive a note held by Hopkins against Samuel Winston for the first instalment.”
Where a’ venda and sub-vendee-received &held possession of lots of ground, ■under a contract which couid not he specifically-enforced against the vendor: Held that vendor should pay the value of improve ment at the time of assessment and vendees the value of the use of the lots du« rinij their holding them, irrespective of improvements. If improvement exceed rents, then alien upon the lots until paid.
*607 If the witness means by this statement that one in-stalment for the lots was paid in hand in a cash note on Winston, yet he fails to give the amount of this payment, as well as the entire amount to be paid for the lots. So that the contract as proven, is within the statute of frauds and perjuries, and is too vague and uncertain to be enforced in a Court of equity. The Court therefore, should have dismissed the bills and amended bills of Hopkins, so far as he sought therein-to have specific execution of the supposed contract, or a decree against Madeira’s heirs for a conveyance of the lots and block of ground in controversy, and a decree should have been rendered in favor of Madeira’s, heirs on their cross bill, establishing their claim and title to said lots and land.
The present actual cash value of the permanent and lasting improvements made on each of the lots, and the block of ground adjacent, (now perhaps also divided off into lots,) and by whom made-, the annual value of the rents of the lots and ground as unimproved, the length of time the several lots and land has been occupied by Hopkins, and those holding under him respectively. The amount paid by Hopkins to Madeira in his life-time, or to his administrators since his death, for the property, and when paid, are matters of fact which *608 should be ascertained by the Court, through a commissioner authorized to take proof and report the necessary information upon the subjects indicated to be collected from the evidence already taken in the cause, and from the testimony of other witnesses, who may have knowledge of any, or all, the matters referred to above.
A vendee sells to sub-vendee who improves, if the first contract be cancelled, the sub- vendees have a lien for imf)Tovem e n t s which i.ssnperior to ‘first vendee for purchase money paid by him.
In estimating the improvements made on the various lots, their actual cash value at the time when the inquiry is being made, and not their cost, is to be ascertained.
In estimating the rents to which Madeira’s heirs are entitled, the annual value of the use of the lots and ground, exclusive of the improvements thereon, should be allowed and decreed to them against the several occupants of the different lots respectively, each being required to pay rent for the period only of his occupation.
The value of the improvements on the several lots should be separately ascertained, and the heirs of Madeira should pay the values thus ascertained, diminished by the rents properly to be credited, to the vaidous occupants and claimants who it shall appear are entitled to the ballances allowed for improvements on each of the lots severally; and the several parties entitled have liens upon the lot or lots as improved by them, and if the heirs of Madeira shall fail, upon a reasonable day given and fixed by the Court, to pay the ballances decreed for improvements, the Court should order a sale of the several lots with the improvements on each, or so much thereof as may be necessary to pay the sums due to each of the parties entitled after deducting rents due from such party.
The accounts between Madeira’s heirs and Hopkins consisting of payments heretofore made by Hopkins, and of rents chargable against him should be adjusted and if the ballance be in favor of Madeira’s heirs, Hopkins should be ordered to pay it. If in favor of Hopkins, Madeira’s heirs should be required to pay him by a day fixed, and on failure to pay the sum, Hopkins may have a lien on the lots subordinate to that of his *609 vendees, to enforce the payment. After the sums decreed for improvements have been paid, if paid by Madeira’s heirs without a sale of the property, then the Court should order and decree that the possession of all the lots be surrendered, with the improvements thereon, and delivered to Madeira’s heirs, and process awarded to enforce the decree. If, however, the sums allowed for improvements are paid only by a sale of the whole property, the Court should order the possession to be given to the purchasers; and if, by a sale of only part of the property, the possession of the residue thereof should be delivered to Madeira’s heirs, the Court should so order, and have the order enforced. Upon the return of the cause the persons now in possession of and claiming the lots, and those from whom they severally derive their claim, may amend their pleadings and, if necessary, be allowed to bring other parties before the Court, in order that there may be an equitable adjustment of all matters in controversy as it respects their several rights and obligations, arising from the sales and purchases of the property or parts of it as made between them; and the Court should retain the cause for the purpose of finally settling all interests involved, and disposing of all the matters in controversy according to the principles of equity as-indicated in this opinion,
Harris* Harlan, and Lindsey, for plaintiffs; Benton & Morehead■ and Stevenson; for defendants.
Wherefore the decrees of the Circuit Court; rendered the 6th of August, 1831, and the decree- rendered on the 21st day of September, 1850, are each reversed, and-the cause is remanded for further, proceedings-to be had, and orders, and decrees rendered in conformity with this opinion.